# EXHIBIT A

Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN | | | CASE NO. |
|---|---|---|---|
| 17TH | JUDICIAL DISTRICT JUDICIAL CIRCUIT COUNTY PROBATE | **SUMMONS** | 2023- 00465 =NO |

**Court address**
180 Ottawa Ave. NW, Grand Rapids, MI 49503

Court telephone no.
616-632-5220

Plaintiff's name(s), address(es), and telephone no(s).
Jane Doe by next friend, Rhonda Brown
c/o Temperance Legal Group PLLC
503 Mall Court #131
Lansing, MI 48912

v

Defendant's name(s), address(es), and telephone no(s).
The Potter's House, Paul DeBoer in his official capacity as President of The Potter's House, The Potter's House Foundation, John Booy individually and in his official capacity as Superintendent for The Potter's House, Mark Ponstine individually and in his official capacity as Principal for The Potter's House, and Alf Clark individually and in his official capacity as Principal for The Potter's House
(c/o John Booy, Resident Agent)
810 Van Raalte, SW
Grand Rapids, MI 49509

Plaintiff's attorney, bar no., address, and telephone no.
Karen Truszkowski (P56929)
Temperance Legal Group PLLC
503 Mall Court #131
Lansing, MI 48912
844-534-2560

GEORGE JAY QUIST

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____ .

The action ☐ remains ☑ is no longer pending.

Summons section completed by court clerk.

**SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| JAN 1 7 2023 | APR 1 8 2023 | LISA POSTHUMUS LYONS |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01    (9/19)    **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

**SUMMONS**

Case No. 2023- _____ -NC

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that:  (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that:  (notarization required) |

☐ I served personally a copy of the summons and complaint,

☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
                     List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) |
| | | | | Title |

Subscribed and sworn to before me on _____ , _____ County, Michigan.
                                          Date

My commission expires: _____    Signature: _____
                          Date                            Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                        Attachments

_____ on _____
                     Day, date, time

_____ on behalf of _____

_____
Signature

STATE OF MICHIGAN

IN THE 17TH CIRCUIT COURT FOR THE COUNTY OF KENT

JANE DOE, by next friend, RHONDA BROWN,

        Plaintiff,

v.

THE POTTER'S HOUSE,
THE POTTER'S FOUNDATION, PAUL DEBOER
in his official capacity as President of THE POTTER'S
FOUNDATION, JOHN BOOY individually and in his official
capacity as Superintendent for THE POTTER'S HOUSE,
MARK PONSTINE individually and in his
official capacity as Principal for THE POTTER'S
HOUSE, and ALF CLARK individually and in his official
capacity as Principal for THE POTTER'S HOUSE,

        Defendants.

Hon. _____ **GEORGE JAY QUIST**

Case No. 2023-00463-NO

---

| | |
|---|---|
| Karen Truszkowski (P56929)<br>Temperance Legal Group PLLC<br>503 Mall Court #131<br>Lansing, MI 48912<br>844-534-2560 phone<br>800-531-6527 fax<br>Karen@temperancelegalgroup.com | Antoinette G. Frazho (P49718)<br>A. Frazho Law Office, PLLC<br>1310 Hudgins Pass<br>Richmond, TX 77469<br>517-327-6979 phone<br>855-815-0051 fax<br>afrazho@frazholaw.com |

---

## COMPLAINT AND JURY DEMAND

Plaintiff, JANE DOE by next friend RHONDA BROWN, together with her attorneys,

Temperance Legal Group PLLC and A. Frazho Law Office, PLLC, hereby files the

following complaint against Defendants, The Potter's House, The Potter's House School Board, and The Potter's Foundation, John Booy, Mark Ponstine, and Alf Clark.

## JURISDICTION AND VENUE

1. This Court has proper subject matter jurisdiction over this action pursuant to Plaintiff's request for damages in excess of $25,000.

2. Venue is proper in this Circuit Court pursuant to MCL 600.1621(a) because Defendants are located in and conduct business in the County of Kent, State of Michigan.

## THE PARTIES

3. Plaintiff was, at all material times, a student at The Potter's House in the City of Grand Rapids, County of Kent, State of Michigan.

4. Defendant, The Potter's House ("Potter"), is a private school receiving federal funds. At all material times, Potter received federal financial assistance via the National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

5. Defendant, The Potter's Foundation ("Foundation"), is a private governing body operating in conjunction with Defendants Potter and the Board which receive federal funds. At all material times, the Foundation received federal financial assistance via the National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

6. Defendant, Paul DeBoer ("DeBoer"), is an individual who was President of the Foundation overseeing a private school receiving federal funds. At all material times, the Foundation may have received federal financial assistance via the

National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

7. Defendant, John Booy ("Booy"), is an individual who at all times was Superintendent of Potter overseeing a private school receiving federal funds. At all material times, Potter received federal financial assistance via the National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

8. Defendant, Mark Ponstine ("Ponstine"), is an individual who at all material times was Principal of Potter's Elementary and Middle School overseeing a private school receiving federal funds. At all material times, Potter received federal financial assistance via the National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

9. Defendant, Alf Clark ("Clark"), is an individual who at all material times was Principal of Potter's High School overseeing a private school receiving federal funds. At all material times, Potter received federal financial assistance via the National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

10. Defendants Potter and Foundation are incorporated and operate as a non-profit organization pursuant to 26 U.S. Code § 501(c)(3) and are exempt from Federal taxation.

## APPLICABLE LAW AND POLICY

11. Defendant Potter receives federal financial assistance and is, therefore, subject to the dictates of Title IX.[1]

12. Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . .

13. Title IX is implemented through the Code of Federal Regulations.   See 34 C.F.R. Part 106.

14. 34 C.F.R § 106.8(b) provides:

> . . . A recipient shall adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by this part.

15. In *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1988), the United States Supreme Court recognized that a recipient of federal educational funds intentionally violates Title IX, and is subject to a private damages action, where the recipient is "deliberately indifferent" to known acts of teacher-student discrimination.

16. In *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999), the United States Supreme Court extended the private damages action recognized in *Gebser* to cases where the harasser is a student.

---

[1] See *Russo v. Diocese of Greensburg, et. al., Memorandum and Order, Sept. 15, 2010, United States District Court for the Western District of Pennsylvania, Civil Action No. 09-1169.*

4

17. *Davis* held that a complainant may prevail in a private Title IX damages action against a school district in cases of student-on-student harassment where the funding recipient is:

> a) deliberately indifferent to sexual harassment of which the recipient has actual knowledge, and

> b) the harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.

*Davis*, 526 U.S. at 1669-76.

### **BACKGROUND FACTS RELEVANT TO ALL COUNTS**

18. The Office of Civil Rights ("OCR"), a division of the United States Department of Education ("DOE"), is responsible for the implementation, interpretation, and enforcement of Title IX.

19. The OCR promulgated numerous documents outlining the requirements for an educational institution to be in compliance with Title IX, including the Dear Colleague Letter of April 4th, 2011 ("DCL"), which specifically concerned peer-on-peer sexual harassment and sexual assault.

20. At the time of the events set forth in this Complaint, the April 4th, 2011, Dear Colleague Letter was in effect and applicable to said events.[2]

21. The DOE was authorized by Congress, pursuant to 20 U.S.C.A. § 1682, to promulgate regulations to govern the implementation, interpretation, and enforcement of Title IX.

---

[2] Former Secretary of Education Betsy DeVos rescinded the Dear Colleague Letter, although it was in effect during the events described in the within complaint.

22. The DCL was a "significant guidance document," intended to provide educational institutions with clarity as to the requirements they must follow to be in compliance with the DOE. Pursuant to 72 Fed. Reg. 3432, a "guidance document" is "an agency statement of general applicability and future effect, other than a regulatory action…that sets forth a policy on a statutory, regulatory, or technical issue or an interpretation of a statutory or regulatory issue." A "significant guidance document" is "a guidance document disseminated to regulated entities or the general public that may reasonably be anticipated to… (iv) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866, as further amended."

23. A failure to adhere to the requirements outlined in the DCL could result in the loss of federal funding for an educational institution.

24. The DCL stated that "Schools are required to publish a notice of nondiscrimination and to adopt and publish grievance procedures."

25. The DCL also required that school "employees are trained so that they know to report harassment to appropriate school officials, and so that employees with the authority to address harassment know how to respond properly."

26. The DCL required that a school identify the name, title, and contact information of the person designated to coordinate the school's compliance with Title IX. This coordinator is responsible for overseeing all Title IX complaints. This coordinator should not have any other job responsibilities that may create a

conflict of interest. Further, the school must ensure that this coordinator has adequate training on Title IX.

27. The DCL also noted that "If a student files a complaint with the school, regardless of where the conduct occurred, the school must process the complaint in accordance with its established procedures." In other words, a school is responsible for processing complaints of student-on-student harassment or assault, even if it occurs off campus, because "students often experience the continuing effects of off-campus conduct in the educational setting…"

28. Further, the DCL stated that a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate a claim of assault.

29. The DCL required the school to "tell the complainant that Title IX prohibits retaliation, and that school officials will not only take steps to prevent retaliation but also strong responsive action if it occurs."

30. As to any potential conflicts of interest, the DCL stated, "a school's investigation and hearings processes cannot be equitable unless they are impartial. Therefore, any real or perceived conflicts of interest between the factfinder or decision-maker and the parties should be disclosed."

31. The DCL required designated and reasonably prompt timeframes for investigation and resolution. Per the DCL, "Based on OCR experience, a typical investigation takes approximately 60 calendar days following receipt of the complaint."

32. In addition to resolving complaints promptly, the DCL also addressed OCR recommendations regarding the use of preventive education programs and comprehensive victim services. Per the DCL, such education and training may be included in "orientation programs for new students, faculty, staff, and employees."

33. The DCL also outlined OCR recommendations regarding complainant safety. The DCL stated, "Title IX requires a school take steps to protect the complainant as necessary, including taking interim steps before the final outcome of the investigation. The school should take these steps promptly once it has notice of a sexual harassment or violence allegation." The DCL continued to state: "[w]hen taking steps to separate the complainant and alleged perpetrator, a school should minimize the burden on the complainant, and thus should not, as a matter of course, remove complainants from classes or housing while allowing alleged perpetrators to remain."

34. The DCL specifically addressed retaliation, stating, "[s]chools should be aware that complaints of sexual harassment or violence may be followed by retaliation by the alleged perpetrator or his or her associates. For instance, friends of the alleged perpetrator may subject the complainant to name-calling and taunting. As part of their Title IX obligations, schools must have policies and procedures in place to protect against retaliatory harassment."

## COMMON ALLEGATIONS

35. In late summer of 2015, James Treadwell ("Treadwell"), was invited to be an 'artist in residence' for the school and maintain a studio in the church building

next to The Potter's House Elementary/Middle School and owned by Defendant Potter. Treadwell was a purported Christian artist in residence.

36. Defendant Booy was the individual inviting Treadwell to be an 'artist in residence' at The Potter's House and maintain a studio in the church building.

37. Upon information and belief, Defendant Booy did not conduct any background check on Treadwell before inviting him to The Potter's House.

38. Treadwell, at that time, was part of a Christian brotherhood, The Servants of The Word, comprising 60 celibate men who live communally, share funds, and share possessions. Treadwell previously resided with The Servants of The Word in London, England, and he relocated to a The Servants of The Word home in Grand Rapids, Michigan in 2015.

39. Plaintiff, during all relevant times, was a student at Defendant Potter.

40. During the 2015-2016 school year, Plaintiff, a 10-year-old female[3], attended 5th grade at Defendant Potter's middle school.

41. Plaintiff participated in the school lunch program offered to children by Defendants through federal financial assistance via the National School Lunch Program (CFDA No. 10.555) administered by the United States Department of Agriculture (USDA).

**Incident One**

42. During her 5th grade academic year, Plaintiff was sexually harassed and/or assaulted by Treadwell at Defendant Potter's facilities.

---

[3] Plaintiff's date of birth is June 24, 2005

43. Specifically, on Monday, January 18, 2016, Defendant Potter held its annual Martin Luther King Jr. Day celebration lunch in the basement of the former Roosevelt Park Christian Reformed Church located next to Plaintiff's school.

44. Treadwell's art studio was located in the basement of the former Roosevelt Park Christian Reformed Church building.

45. There was a potluck with each student bringing an item, and Defendant Potter bringing artists to do projects with the children. Treadwell's studio was in the basement of this building.

46. On January 18, 2016, Plaintiff's 5th grade teacher[4] escorted Plaintiff, and other students, to an art class with Treadwell.

47. Eventually, Plaintiff was left alone with Treadwell, and Treadwell isolated Plaintiff on one side of the room, proceeding to engage in inappropriate sexual behavior.

48. When Plaintiff was alone with Treadwell in the classroom, Treadwell approached Plaintiff, physically touched her, pushed his hand down Plaintiff's pants, and touched and massaged her vaginal region with his hand/fingers. Treadwell told Plaintiff that "this is okay" while he sexually assaulted her.

49. Plaintiff left the art class in shock and confusion, and she returned to her classroom. Later that day, parent retrieved Plaintiff from school. Plaintiff had no interaction with Treadwell before January 18, 2016.

50. On Friday, September 30, 2016, a student counselor at Defendant Potter informed Defendant Booy of the potential sexual harassment and assault

---

[4] For privacy reasons, the name of the teacher is not being disclosed.

allegations regarding Treadwell. Defendant Booy, in lieu of protecting the children at The Potter's House, elected to take a vacation that same day in New York, New York.

51. Upon information and belief, once Defendants were notified of the allegations, Defendants had an absolute statutory duty to report the conduct forthwith to Michigan Department of Health and Human Services, Children Protection Services, and potentially law enforcement.

52. On Saturday, October 1, 2016, the dean of students[5] telephoned Defendant Booy and shared the sexual harassment and assault allegations regarding Treadwell with Defendant Booy. The dean of students also advised Defendant Booy how the matter should be handled properly to protect the children and advise the families.

53. On Saturday, October 1, 2016, Parent SS[6] also telephoned Defendant Booy and spoke with Defendant Booy for approximately 35 minutes. During that telephone conversation, Defendant Booy stated "[w]hy can't you control your elders?" and advised Parent SS that a number of years ago parents of students attending The Potter's House conducted a 'witch hunt' against a former teacher which subsequently ruined that teacher's career and marriage.

54. On Thursday, October 6, 2016, Defendant Booy telephoned Parent SS and advised Parent SS that "Jamie [Treadwell] will remain my friend until proven otherwise."

---

[5] Upon information and belief, the dean of students left the Potter's House shortly after the disclosure occurred.
[6] Initials are utilized to protect the privacy of the individual. Parent SS was an Elder in local church.

55. Following the telephone conversation on October 6, 2016, Parent SS

electronically sent the following letter to Defendant Booy:

Dear John,

On behalf of the elders of ████████████████████████, I am writing with the permission of ████ and ████████, members and current elders in the church, in order to provide you with more information regarding the relationships and experiences they and other families in our congregation have had with Jamie. Our hope and desire is that this will help you lead and guide Potter's House through this difficult time.

The ██████ were introduced to Jamie Treadwell at an art evening in December 2015, which was hosted at the home of some friends from ████████████████████. Their two daughters— aged 7 and 10 at the time, now 8 and 11—made an immediate connection with Jamie over his art. Soon, Jamie began attending worship at ██████████ and sitting with the █████ family. ████ and ██████ welcomed his friendship. When ██████ was away for several weeks for ████'s Interim in January 2016, Jamie spontaneously invited himself over to their house for lunch after church, a pattern that continued upon ██████'s return. The ██████ noted the self-invitations as odd, but thought little of it. They accepted his explanation that, as a single man who traveled, he had to work to build meaningful relationships with families. The ██████ girls greatly enjoyed having Jamie around and he began building a stronger relationship with them than with ████ and ██████. Indeed, the ██████ noticed that Jamie was almost always touching their girls if they were within his reach. He rubbed their backs, arms, and legs. When he was in church or doing things around the ██████'s house, he usually had one of their girls in his lap. This caused ████ and ██████ to keep a closer eye on Jamie than they normally would.

Then, in May, when Jamie invited himself over for a sleepover at their house, their eyebrows were raised because he lives nearby and did not need a place to stay. However, Jamie explained that it would be fun and that his birthday was the following day and his housemates were away so he would appreciate being able to celebrate with them. Since Jamie presented the idea in front of their daughters, ████ and ██████ did not want to disappoint them. The explanation was plausible, if odd, so ████ and ██████ consented. Nonetheless, ██████ spent the night in the girls' bedroom as a precaution. Jamie spent two more nights at the ████'s house on different occasions and one night with the ██████ when they were away at a friend's cottage. On all these occasions, either ████ or ██████ always stayed with the girls. After that, ██████ noticed a pattern developing. Jamie kept seeking unsupervised time with the girls. For example, when he came over for the sleepover, he asked the girls to show him to his room. When ██████ followed up to see where they were, they were playing "tickle games" with him on his bed. Also, when Jamie would come over for dinner, he would arrive earlier than arranged, when ████ was not yet home and ██████ was busy preparing dinner. Although the ██████ would ask their girls to stay in view when Jamie came over, Jamie would take them to parts of the backyard where ██████ could not see them. When she would go to find them, they would often be rolling around on the ground playing another version of the "tickle games" or "the rocking game," both of which involved holding, rolling, and full- body contact. When the ██████ later asked their daughters about contact during these games, their older daughter reported that he touched her tender, developing breasts several times during one of those sessions. She remembered this because it hurt, but did not know that it was wrong. ██████ steadily narrowed the time gaps she would allow him to have with them without one of their parents present. They also noticed that when one of the girls was on his lap, Jamie would sometimes kiss them on the head. Since their younger daughter is very trustingly cuddly, she and Jamie would kiss each other on the cheek. Not wanting to accuse, but worried, ████ and ██████ kept a closer and closer eye.

12

However, the events of two days transformed the ▆▆▆▆'s concerned-but-charitable view of what was going on, which prompted them to end their relationship with Jamie. The first was Sunday, September 18, when Jamie again invited himself over for lunch after church. While ▆▆▆▆ was preparing the meal and ▆▆▆ was helping, Jamie was alone with the girls in the living room. Nervous about any alone time, ▆▆▆▆ asked ▆▆▆ to go to the living room. While ▆▆▆ was watching and Jamie was seemingly aware of his presence, his younger daughter was on Jamie's lap and his hands were rubbing up and down her outer thighs. This motion began to extend until his hands were rubbing around her buttocks. ▆▆▆ found this upsetting, but still ambiguous. Then, while she was sitting on Jamie's lap with her legs apart, his hand casually fell between her legs. He briefly rubbed her vulva through her tights and then withdrew his hand. Shocked and deeply concerned, ▆▆▆ told ▆▆▆▆ immediately upon Jamie's departure. They now knew that they needed to act, so they contacted the pastor of Sherman Street Church to share their story, to find out if there were other known problems, and to get counsel. Our pastor, ▆▆▆▆▆▆▆▆, advised the ▆▆▆▆ to play it carefully and quietly, to not make accusations, and to set boundaries with Jamie in a non-confrontational way. Pastor ▆▆▆▆▆▆ also told them that they had reason to be concerned, but no reason to make an accusation.

The second transformative day was the following Sunday, September 25. Since Jamie had almost always sat with the ▆▆▆▆ at church, they were surprised that he had, with no explanation, on the previous Sunday, September 18, sat with another family. After the service ▆▆▆ saw him crouched down and interacting with the young daughter of this family. Suspicions raised, ▆▆▆ mentioned it to ▆▆▆ and wondered if they should say something to the mother. A week later, on September 25, Jamie again sat with this same family, who, this time, was sitting one row behind the ▆▆▆▆ family. ▆▆▆ and ▆▆▆▆ watched as Jamie had their daughter on his lap through much of the first part of the service. Then, when he stood to sing, Jamie held her with her arms and legs wrapped around his shoulders and waist. At one point, when she went to sit next to him, ▆▆▆ and ▆▆▆▆ both saw him reach around and pull her on to his lap, a maneuver they had also seen with their younger daughter. ▆▆▆ and ▆▆▆▆ immediately made arrangements to talk with the mother of this young girl. Then, when the ▆▆▆▆ approached Pastor ▆▆▆▆▆▆ a second time, it was decided that they needed to tell the church elders the following Tuesday evening, September 27. In preparation for the meeting, the ▆▆▆▆ decided to talk with those elders whose children had interacted with Jamie, including the elder they had seen in church on September 25. During the conversation with that mother, she expressed strong concern about the way Jamie, who lives a block from their house, was interacting with her daughter. She also expressed gratitude to ▆▆▆▆ for speaking up, and said that a neighbor of hers had expressed concern about Jamie's interactions with her own daughter. ▆▆▆ then met with another family, although he had no knowledge that this family had anything more than passing contact with Jamie. The mother of this family immediately added that she had been worried for weeks about Jamie ever since their family had been with him and other families on a camping trip. She felt there had been unusually close contact and that her daughter had become quickly and troublingly emotionally connected to Jamie. They pointed to an additional family at Sherman Street whose young daughter Jamie had started to get to know, although that was in the early stages.

In light of all of this, we, the elders, recommended that the ▆▆▆▆ report their concerns to the police during our elders meeting on Tuesday, September 27. Knowing that Jamie was an artist in residence at the Potter's House, we also recommended that ▆▆▆▆, chair of the Administrative Council at ▆▆▆▆▆▆▆▆ and an elder in the church, should speak with his wife, ▆▆▆▆, who is a counselor on the staff at the Potter's House with the understanding that she would make you aware of the concerns the ▆▆▆▆ had raised.
The next day, Wednesday, September 28, the ▆▆▆▆ called the East Grand Rapids police. The police immediately sent an officer to their house. The officer listened to their story and took their written log of experiences with Jamie. During the meeting, it would be fair to say that the officer expressed some incredulity that the ▆▆▆▆ had taken so long to report their

concerns to the police. The police, as you know, are now pursuing an investigation. The ██████ now believe that they were wrong to have had such a high threshold for speaking up. They have subsequently learned from professionals in the field that their delay in reporting after observing Jamie's particularly troubling touch of their daughter may have weakened the government's case for prosecution and, if they had not cut off contact with Jamie when they did, would have stepped dangerously close to child neglect on their part.

The police then arranged an appointment for the ██████ girls the following day at the Children's Assessment Center in Grand Rapids where they spent three hours being extensively interviewed by a forensic psychologist. Although they do not have the report from those interviews, ████ and ██████ got the indication that their girls have not experienced anything more traumatic than what they already knew. This was a relief.

At this point in the investigation, no official statements can be made about the situation. Nonetheless, police, investigators and counselors who have experience in such matters have unanimously affirmed that this is a dangerous situation, that Jamie's behavior is troubling, that the ██████s concerns are well founded, and that what they have seen fits classic patterns of what is called "grooming." The ██████ have no idea what will happen concerning charges, prosecution or conviction. These matters are very difficult and have different aims from determining wrongdoing and harm. For the sake of their family, the ██████ have been advised to not permit their daughters to even catch a glimpse of Jamie in the future. Their emotional draw to him is strong and they obviously have a limited understanding of why these matters are so important. Still, the ██████ and ██████ are willing to talk with Jamie, and even reached out to him to have an adult conversation. However, the police have asked the ██████ to let the police make first contact in order to avoid fouling their investigation. For now, the ██████ and I are only notifying people of these experiences when they feel they need to know something now for safety's sake. In the case of the elder who notified ██████ ██████ however, this was a mistake. I can assure you that I told, and have reminded the elders again, that the details of what we discuss in elders meetings are confidential. Furthermore, we also recognize that you and the other members of the Potter's House also find yourself in a challenging circumstance.

This is why we thought it would be helpful to start thinking through the risks and harms that have occurred in this situation, even if the threshold of a sexual crime cannot be legally proven to have been crossed. This, then, is our first attempt at such a list; a list of what has been done by such behavior even in that case:

1. Jamie has regularly been just one moment away from doing devastating, lasting psychological harm to an innocent child and has, from whatever motivation, set up a system for dwelling right at that line, at the very least. This is dangerous for everyone involved. People should not dwell on such lines.
2. He's made emotional commitments to children that he cannot keep. He is not family. He will not be there for them when they need him. He has made individual children feel special in a way that is deceiving and destructive for their developing sense of relationships with other people.
2. He's created a wedge between children and their parents, requiring parents to be the ones who set limits to him and their children realizing their "fun" together.
4. He's normalized relationships and contact that should not be normal, and other people with harmful intentions can exploit this normalization. Parents' and children's defenses have been lowered so that they are less attentive than they should be.
5. He's created stresses within families as the parents and caregivers struggle to figure out where boundaries should be and how they should be maintained. The ambiguity is very stressful as people grapple with what to say and what to do. This ambiguity has created internal conflicts that hinder speaking truth and taking action.
6. In the same way, he's created stresses within the church family.

Our hope is that the information contained in this letter will help you guide the Potter's House through this difficult time. If you have any questions or concerns, please do not hesitate to contact me. I also want you to know that both the ███████ and I am more than willing to sit down to discuss these matters further if it would be helpful.

Sincerely,



Chair of Elders
███████████████

56. On October 6, 2016 at 3:36 PM, Defendant Booy responded to the Parent SS

electronic communication as follows:

From: John Booy <jbooy@tphgr.org>
Sent: Thursday, October 6, 2016 3:36:36 PM
To: ████████████
Subject: Re: Letter Re: Jamie

Thanks so much ██████. I appreciate the time you put into this.
The Servants of the Word have many rules about this. I think they don't even allow two brothers to go on vacation together. It must be three. I could be wrong on that but it's what I understand. I also had no idea Jamie went to ████████ until ████████ told me. I have no frame of reference for any of this. Thanks for all you do. You are a good man.

John

57. Parent SS and Defendant Booy continued to have email communications on

October 6, 2016 and October 7, 2016 regarding the allegations against

Treadwell.  On Friday, October 7, 2016 at 11:37 AM, Defendant Booy sent an

email to Parent SS referencing disclosure of the allegations and how it should

be handled.  Specifically, Defendant Booy stated:

From: John Booy <jbooy@tphgr.org> Sent: Friday, October 7, 2016 11:37 AM
To: ████████████
Subject: Re: Letter Re: Jamie

Thanks ██████. I understand those concerns.
I have board meeting on Monday which makes it a little tricky and of course the fact that he has a studio here.

Jamie has voluntarily not been at the studio since this began and I do not anticipate a change in that since I would be in control of that decision.

I am still at a quandary over who should know what. But I will err in keeping that circle very small. So far only four people are aware of who this concerns which includes ████████. Three

15

additional staff know allegations have been made concerning a staff member. Of course there may be some that I am not aware of.

John

58. Defendant Potter also consulted its attorney regarding the allegations involving sexual harassment and/or assault committed by Treadwell. Defendant Booy forwarded Defendant Potter's attorney's assessment to Parent SS on Friday, October 14, 2016.

59. On Thursday, January 5, 2017, the following correspondence was sent to Defendant Booy, Defendant Ponstine, and Defendant DeBoer:

Dear Friends,

We, the parents of children who attend the Potter's House School (PHS), are writing to express our gratitude for the education our children are receiving at the school and for their robust formation in the faith. We believe that PHS has been and is a remarkable place. And we have been delighted to be a part of it. Because of our care for the institution, we are writing to express some very serious concerns regarding the safety of the children at PHS. Given the fact that PHS deals with one of the most vulnerable populations in our city, we believe PHS must continually pursue the highest standards of excellence regarding child safety to adequately serve that population.

A recent crisis has helped to bring to light the importance of pursuing best practice in these matters.

In late September, we became aware of serious allegations of sexual misconduct with young girls from multiple families at ███████████████████████ and another family in Lansing, Michigan. These allegations were brought against Jamie Treadwell, an artist-in-residence at PHS. These allegations resulted in multiple police investigations of Mr. Treadwell. Given what we have learned about grooming behaviors, sexual predators, and safe body policies through numerous conversations with a number of different experts, including individuals from the Children's Assessment Center (CAC), we have concerns about the current adequacy of PHS's safety policies. Moreover, even though there have been no official charges, there remains significant reasonable concern about Jamie's behavior and the possibility of harm done to PHS children, whether at school or at home. These concerns were only heightened when we learned, in early December, that three families in London, which is where Jamie lived before moving to Grand Rapids, expressed concern about Jamie's "problematic boundary issue behavior" with their prepubescent daughters, and that, in the spring of 2015, a more specific concern regarding Jamie was brought to the attention of the child protective authorities in London.

In regards to this current set of events, our interactions with John Booy have not been what we have come to expect of him. John has, in the past, always acted in ways that merited and deepened our trust and respect. Yet our personal experience during our exchanges with John since he was made aware of the details of the allegations in late September has failed to live up to these expectations. Rather than sharing our concern for the safety of the children at the

school, John has consistently and emphatically defended Jamie despite having been provided with extensive details of the abuse allegations raised by four different families from the ▮▮▮▮▮▮▮▮ community. When we have encouraged him to inform the board, administration, and families that an individual with access to students at PHS was under investigation for child sex abuse, he has resisted. It is our understanding that he chose to simply state that an individual connected to the school was under investigation by the police.

It is also our understanding that two years ago a social worker employed at PHS contacted the Children's Assessment Center (CAC) of Kent County to look into the possibility of implementing their body safety training for children. Having been told this was a possibility, the social worker then asked an administrator for approval to invite the CAC to implement such a program. Although this program has been successfully implemented in other Christian schools such as ▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮, the social worker was told that this would not be possible since PHS has split classrooms. The CAC has informed us that they have implemented their program in a number of schools with split classrooms.

Although we cannot claim to understand the bind this situation must have created for PHS leadership, our experience with this recent crisis has shown how an institution's policies, despite the best intentions of many intelligent, faithful individuals, if not guided by experts like those at the CAC, can still be inadequate to protect it's most vulnerable members. We have likewise become aware that, despite the best intentions of many faithful individuals at PHS, the safeguards of PHS may also be inadequate. Key concerns include:

o The adequacy of child body safety education (refused two years ago when offered by the CAC and no response to the CAC's repeated offers over the past few months)
o Failure to consistently perform thorough background checks of school personnel and volunteers
o Inconsistent check-in process for school visitors (currently, many visitors simply bypass the process)
o The adequacy of policies for child safety, including such things as adults alone with students
o The adequacy of policies for handling allegations concerning people with access to students
o The lack of explicit opportunities for students and parents to raise safety concerns and have those concerns taken seriously

Having voice some of the aforementioned concerns to Mark Ponstine, we were encouraged to hear from ▮▮▮▮▮▮▮▮, the clinical services manager at CAC, that Mark recently contacted the CAC and invited them to implement their body safety training with the K – 4th graders at the Potter's House. Since we desire to see PHS continue its excellent work in serving this vulnerable population, we strongly suggest that PHS develop and maintain a close partnership with the CAC to address these and any other concerns so that PHS can become a model of providing a safe environment for students. In light of the prevalence of abuse of children in our culture at large and the unique vulnerability of children at PHS, we believe PHS, in partnership with the CAC, ought to implement a proactive program for discovering any previously undisclosed problems and care for those affected. We believe that the desire for the highest standards of excellence in protecting the children of PHS will likewise be a priority of the Board.

Consequently, we are writing to strongly urge that the following actions also be taken to restore our confidence in the school and directly address the issues listed above. We call on the board to:

1. Request a review of the current safe school plan, policies, and procedures by the CAC.

17

2. Request that the CAC conduct an assessment of the school's adherence to the current safe school plan, policies, and procedures.

3. Ask the CAC to review Erin's Law with the PHS administration and staff.

4. Work with the CAC in assessing any of the children and families who spent time with Jamie Treadwell.

For PHS to fulfill its mission to "encourage students to reach their full potential by maintaining a healthy, spiritual, physical, social, and emotional life," it is important to initiate communication and conversation to reduce the barriers for victims to come forward so that they can give voice to their wounds and seek healing.

Stories of sex abuse survivors and particularly those in Christian institutions share an unfortunate common theme: victims are, more often than not, left wondering why their parents, pastor, superintendent, principal, or teacher did not do anything. Over and over again survivors are left dealing with the pain of not being given a voice and not seeing any measure of justice served, which is almost as painful as the abuse itself.

Our hope is that this will not be a part of the story of any of the children at PHS. So we urge you to make the difficult, but right decision to choose transparency on behalf of those who are most important: our precious children.

Because of the delicacy of the issues at hand, before we send this letter to the entire board of directors, we urgently desire to discuss these concerns in person with John Booy, Mark Ponstine, Paul DeBoer, and ▮▮▮▮▮▮. Please let us know when such a meeting would be possible at your earliest convenience.

Sincerely, ▮▮ and ▮▮▮▮▮▮, ▮▮ and ▮▮▮▮▮▮

60. After no response was provided to the January 5, 2017 correspondence by Defendants and its agents, Parent MG[7] sent an email to Defendant Booy, Defendant Ponstine, and Parent SS on Friday, January 13, 2017 at 3:43 PM:

**From:** ▮▮▮▮▮▮▮▮▮▮
**Sent:** Friday, January 13, 2017 3:43 PM
**To:** ▮▮▮▮
**Cc:** John Booy; Mark Ponstine; ▮▮▮▮▮▮▮
**Subject:** Re: Request for a meeting about child safety policies at PHS

Dear friends,

I have not heard anything regarding our request for a meeting. I am somewhat disturbed by the lack of response. If you, our friends at PHS intend to schedule a meeting, please let us know and advise us as to the timeframe for that scheduling. If you do not intend to honor our request for a meeting, please indicate that to us so we can decide on next steps. We will

---

[7] Initials are utilized to protect the privacy of the individual.

expect a response by Wednesday. If we hear no response, we will presume to do not intend to meet with us.

Peace of Christ rest upon you all.



61. After receipt of the January 13, 2017 email sent by Parent MG, Defendant DeBoer responded and agreed to schedule a meeting, which subsequently was arranged by Defendant Booy's executive assistant on or about January 23, 2017. The meeting was held on Monday, February 27, 2017 with Parent MG, Parent JG[8], Parent SS, and Parent LS[9], Defendant Booy, Defendant Ponstine, and Defendant DeBoer.

62. Following the February 27, 2017 meeting, agents for Defendants failed to provide any follow-up or response regarding the concerns raised. On Monday, April 10, 2017, an email was sent to Defendants which stated:

Dear Potter's House School Board Members,

It has come to our attention that the board has decided to organize a committee to form and implement a comprehensive, best-of-class safe school policy, and that a new safe school policy will be put to a vote before school begins this August [▇▇▇▇▇▇ had learned this information via a text from ▇▇▇▇▇▇▇▇▇▇, the parent representative on the Potter's House School Board]. This is terrific news! Thank you for taking on this very important task. Given the national coverage The Potter's House has received as of late, it is all the more important that TPH have a best-of-class safe school policy in place that is easily accessible to concerned parties.

As you research and compose the policy, we, concerned TPH parents, would like to share some of our own experiences and concerns for your consideration by way of the attached parent letter detailing our requests for action. You will notice that we requested that the board include outside experts on the committee. This is essential if TPH is going to create and implement a best-of-class safe school policy. We are also sharing an updated letter recording the events that unfolded at ▇▇▇▇▇▇▇▇▇ (an earlier version of this letter was shared with the leadership of TPH) as well as a few articles that indicate our concern for the potential exposure TPH has given recent events at Penn State and MSU.

---

[8] Initials are utilized to protect the privacy of the individual.
[9] Initials are utilized to protect the privacy of the individual.

69. In May of 2020, Treadwell was charged with two felony counts of Criminal Sexual Conduct 1st, contrary to MCL 750.520(b). One of these felony counts involved the sexual assault perpetrated against Plaintiff.

70. In June of 2020, a Preliminary Hearing was conducted where Plaintiff testified at the hearing. The matter was bound over to the 17th Circuit Court in Kent County, Michigan.

71. On April 13, 2022, Treadwell was sentenced to a no contest plea of Attempted Criminal Sexual Conduct 1st in the 17th Circuit Court in Kent County, Michigan. Treadwell received 14 days in jail, 18 months' probation, and required registration as a sex offender.

72. Defendants imposed no discipline or immediate action upon Treadwell, despite being placed on notice regarding Treadwell's actions against students, being in direct violation of Title IX.

73. Defendants took no action to protect the student body, including Plaintiff, or to provide them with rights available through Title IX once they learned of Treadwell's conduct and criminal actions.

74. Defendants failed to commence an internal investigation, failed to implement protections, failed to provide accommodations for Plaintiff, and failed to have any Title IX policy whatsoever.

75. Defendants were duly notified that Plaintiff was sexually harassed and assaulted by Treadwell. Defendants did not commence an internal investigation, did not advise Plaintiff of her Title IX rights, did not offer Plaintiff counseling, did not offer Plaintiff academic support, and did not offer Plaintiff

appropriate or adequate accommodations. Indeed, Defendants did not even have a designated Title IX coordinator or have a Title IX policy in place.

### Incident Two

76. In Fall of 2019, Plaintiff was a 14-year old freshman attending Defendant Potter's high school.

77. Another student ("JRF"[10]) at Defendant Potter was a senior on a student visa and of the age of majority.

78. JRF engaged in a physical relationship with Plaintiff. Due to Plaintiff's age, she was legally unable to consent to this relationship with JRF.

79. Defendants Potter and Clark became aware of the physical relationship between Plaintiff and JRF through monitored student emails. Defendant Clark notified Plaintiff's parent of the discovery.

80. On November 18, 2019, Plaintiff's parent expressed concern that JRF was permitted to attend The Potter's House after proof of his criminal activity was discovered by Defendant Clark. Plaintiff's parent also advised Defendant Clark that the legal age of consent in the State of Michigan was 16 years.

81. On November 19, 2019, Defendant Clark advised Plaintiff's parent that a no contact directive at the high school would be enacted between Plaintiff and JRF.

82. Defendant Clark informed Plaintiff's parent that he would follow the lead of the detective in the criminal investigation.

---

[10] Initials used to protect the individual's privacy.

83. Plaintiff's parent filed an incident report with the Wyoming Police Department in Kent County, Michigan. Subsequently, JRF was charged by the Kent County Prosecutor's Office with Criminal Sexual Conduct 3rd.

84. Defendants Potter and Clark failed to remove JRF from The Potter's House, and in fact, and in fact Defendant Clark chastised Plaintiff for her "inappropriate" use of school email.

85. Defendants Potter and Clark did not remove JRF from school grounds until a few months after the discovery, and they only did so to protect JRF.

86. Defendants Potter and Clark allowed JRF to attend school online, and they permitted JRF to graduate from The Potter's House high school.

87. JRF eventually entered a plea to Contributing to the Delinquency of a Minor contrary to MCL 750.145, and JRF was placed on probation under MCL 761.11.

88. In both of these incidences, Defendants went above and beyond to accommodate the perpetrator in every way possible, causing the victim additional emotional trauma.

89. Defendants placed the rights of the perpetrator over the safety and well-being of the Plaintiff, demonstrating clear deliberate indifference to Plaintiff and her rights.

90. Plaintiff suffered sex-based harassment that was pervasive and objectively offensive.

91. The sex-based harassment deprived Plaintiff of access to the educational opportunities or benefits of the school.

92. Defendants' conduct was such that students in Plaintiffs' circumstances would be chilled from reporting instances of sexual harassment or abuse in the future.

93. As a direct and proximate result of the harassing educational environment created by Defendants' deliberately indifferent response to the sexual harassment and assault, Plaintiff suffered psychological damage and emotional distress.

94. Plaintiff has been deprived of a normal childhood education due to Defendants' conduct and the resulting hostile educational environment.

95. Plaintiff has been damaged by missed educational opportunities and her future earnings capabilities have been damaged by Defendants' conduct and the resulting hostile educational environment.

**COUNT 1**
**VIOLATION OF TITLE IX AS TO DEFENDANT POTTER**
**AND DEFENDANT FOUNDATION (20 U.S.C. § 1681, et. Seq.)**

Paragraphs 1 through 95 are incorporated by reference as if stated in full herein.

96. The sex-based harassment articulated in Plaintiff's common allegations was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational benefits provided by the school.

97. Defendants Potter and Foundation created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681 (a) ("Title IX"), because:

    a. Plaintiff was a member of a protected class;

b. Plaintiff was subjected to sexual harassment in the form of a sexual assault perpetrated by a fellow student and, after the assault, subjected to harassment in the form of her rapist following her at school and at extra-curricular events, brushing up against her, and muttering to her under his breath (whispering to conceal from others what he said);

c. Plaintiff was subjected to harassment based on her sex; and

d. Plaintiff was subjected to a hostile educational environment created by Potters' lack of effective and appropriate policies and procedures to properly prevent, investigate, and address sexual assault and harassment, and failure to protect Plaintiff from her attacker's subjugation and presence.

98. Defendants Potter and Foundation had actual knowledge of the sexual harassment and assault created by their failure to protect Plaintiff in a timely manner and consistent with federal law.

99. Defendants Potter and Foundation's failure to promptly and appropriately respond to the sexual harassment and assault resulted in Plaintiff, based on her sex, being excluded from participation in, being denied the benefits of, and being subjected to, discrimination in Potters' education programs and activities in violation of Title IX.

100. Defendants Potter and Foundation failed to take immediate, effective remedial steps to resolve the complaints of sexual harassment and instead acted with deliberate indifference toward Plaintiff.

101.  Defendants Potter and Foundation persisted in its actions and inaction even after it had actual knowledge of the harm suffered by Plaintiff.

102.  Defendants Potter and Foundation engaged in a pattern and practice of behavior designed to discourage and dissuade students who had been sexually harassed, and parents of these students, from seeking assistance and protection.

103.  This policy constitutes disparate treatment of female students and has a disparate impact on female students.

104.  Defendants Potter and Foundation did not have even minimal compliance with Title IX for the following reasons:

a.  Defendants Potter and Foundation had no designated Title IX Coordinator;

b.  Defendants Potter and Foundation had no Title IX policies or procedures;

c.  Defendants Potter and Foundation did not conduct Title IX investigations;

d.  Defendants Potter and Foundation provided no training in Title IX policies and procedures to its staff, faculty, or students; and

e.  Defendants Potter and Foundation had no designated reporting procedure for gender-based harassment complaints.

105.  Upon information and belief, as of the date of this Complaint, Defendants Potter and Foundation still have not implemented, provided, and/or published a Title IX policy as required.

106.  Plaintiff has suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of future earnings, and past and ongoing medical

expenses as a direct and proximate cause of Defendants Potter and

Foundation's deliberate indifference to her rights under Title IX.

## COUNT II
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## AS TO ALL DEFENDANTS

Paragraphs 1 through 106 and its subparts are incorporated by reference as if

stated in full herein.

107.    Defendants deliberately supported the perpetrator Treadwell after

discovering the allegations and continued to allow Treadwell to remain in

residence at The Potter's House.  Defendants completely disregarded the

devastating impact this would have on Plaintiff, the victim, and the student

body.

108.    Defendants Potter and Clark deliberately allowed the perpetrator JRF,

after discovering the allegations, to remain on school grounds.  Defendant

Clark also chastised Plaintiff for her behavior regardless of the fact the JRF

committed criminal acts upon Plaintiff.

109.    Defendants deliberately refused to protect Plaintiff from Treadwell and

JRF.  Even after learning of the sexual harassment and assault allegation,

Defendant refused to remove JRF from the premises, allowing him to freely

access any part of the school and the students therein.

110.    In order to avoid JRF, Plaintiff did not attend activities and/or certain

school locations in attempts to avoid contact with JRF, denying her the

opportunity to socialize and enjoy such events as a normal teenager would

have done.

111. Defendants Potter and Foundation, a school whose premises are to provide an education based on Christian principles, chose to ignore the agony of a sexually harassed and assaulted victim in favor of the perpetrator, while providing the perpetrators with accommodations.

112. Defendants failed to notify Plaintiff of her Title IX rights, failed to provide any protections or accommodations, and failed to conduct an internal investigation, all in violation of federal law.

113. Defendants' conduct was extreme and outrageous.

114. Defendants' conduct was intentional or reckless.

115. Defendants' conduct caused Plaintiff to suffer severe emotional distress accompanied by physical manifestations of said distress (such as headaches, nausea, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

**COUNT III**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**AS TO ALL DEFENDANTS**

Paragraphs 1 through 115 and its subparts are incorporated by reference as if stated in full herein.

116. Defendants deliberately supported the perpetrator by placing Treadwell's artwork within The Potter's House for victimized student body members to witness daily.

117. Defendants Potter and Clark deliberately supported perpetrator JRF by allowing him to continue attending school in person and chastising Plaintiff for her behavior.

28

118. This resulted in Plaintiff and the student body witnessing the high regard Defendants held for Treadwell and JRF.

119. Defendants Potter and Foundation, a school whose premise is to provide an education based on Christian principles, chose to ignore the agony of a sexual assault victim in favor of the perpetrator.

120. Defendants failed to notify Plaintiff of her Title IX rights, failed to provide any protections or accommodations, and failed to conduct an internal investigation, all in violation of federal law.

121. Defendants' conduct would naturally and probably result in emotional distress.

122. Defendants' conduct caused Plaintiff to suffer severe emotional distress accompanied by physical manifestations of said distress (such as headaches, nausea, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

## COUNT IV
## <u>NEGLIGENCE AS TO ALL DEFENDANTS</u>

Paragraphs 1 through 122 and its subparts are incorporated by reference as if stated in full herein.

123. At all relevant times, Defendants owed Plaintiff and the student body a duty to provide a safe and appropriate environment for Plaintiff to learn and to receive the benefits of an education provided by Defendants.

124. Defendants failed to provide a safe and appropriate environment for Plaintiff and the student.

a. When Defendants failed to protect Plaintiff from her rapists (Treadwell and JRF) on school grounds, extra-curricular events or at school sponsored events and activities by creating a hostile environment when bringing a pedophile on school grounds.

b. When Defendants failed to comply with Title IX federal law: Defendants did not conduct an internal investigation, did not notify Plaintiff of her Title IX rights, protections, and accommodations, and did not actively implement any accommodations or protections for Plaintiff.

125.   It was reasonably foreseeable, given the prior sexual abuse allegations regarding Treadwell in London, England, that Defendant Booy would need to supervise Treadwell in all interactions involving minor children, including Plaintiff.

126.   Defendants Booy and Ponstine breached their duty to provide reasonable supervision of Treadwell, and their failure permitted Treadwell to commit acts against the student body, including Plaintiff, since Treadwell was placed in a position of trust.

127.   If not for Defendants Booy and Ponstine's negligent supervision of Treadwell, Treadwell would not have had any contact with Plaintiff alone in art class.

128.   Defendant Clark, once aware of the sexual assault committed by JRF upon Plaintiff, breached his duty to provide reasonable supervision of JRF,

and his failure placed Plaintiff in a reasonable fear of reprisal while prioritizing the needs of the perpetrator.

129. Defendants' conduct exhibited reckless indifference to, and/or disregard of, the foreseeable risks of harm to Plaintiff.

130. As a direct and proximate cause of Defendants' violation of its duty to Plaintiff, Plaintiff suffered, and continues to suffer, severe emotional distress accompanied by physical manifestations of said distress (such as headaches, nausea, nightmares, night terrors, and inability to sleep), and other harms to be established at trial.

## COUNT V
## NEGLIGENCE PER SE AS TO DEFENDANT BOOY, DEFENDANT PONSTINE, AND DEFENDANT CLARK

Paragraphs 1 through 130 and its subparts are incorporated by reference as if stated in full herein.

131. At all relevant times, Defendants Booy, Ponstine, Clark and other unnamed agents of The Potter's House had an affirmative statutory duty to report the allegations of child abuse to the Michigan Department of Health and Human Services, Children Protective Services.[11]

132. Defendants Booy, Ponstine, and Clark's positions with The Potter's House fall within 'school administrator' pursuant to Michigan statute.

---

[11] MCL 722.623(1)(a)

133.    Defendants Booy, Ponstine, and Clark, as agents of Defendant Potter, are civilly liable for the damages proximately caused by their failure to report child abuse which occurred to members of the student body.[12]

134.    Defendants Booy, Ponstine, and Clark's failure to report the child abuse inflicted upon members of the student body at Defendant Potter could have resulted in misdemeanor criminal charges.[13]

135.    Defendants Booy, Ponstine, and Clark had a duty to provide reasonable supervision of Treadwell when he interacted with the student body, including Plaintiff.

136.    As a direct and/or proximate result of Defendants Booy, Ponstine, and Clark's negligent failure to supervise, Plaintiff suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of future earnings, and past and ongoing medical expenses, and loss of tuition.

**COUNT VI**
**BREACH OF CONTRACT AS TO DEFENDANT POTTER**
**AND DEFENDANT FOUNDATION**

Paragraphs 1 through 136 and its subparts are incorporated by reference as if stated in full herein.

137.    Plaintiff's parent entered a contract with Defendants by enrolling Plaintiff in Defendants' school when Plaintiff was 10-years old.

138.    Said contract was an on-going contract.

---

[12] MCL 722.633(1)
[13] MCL 722.633(2)

139.   Plaintiff's parent paid Defendants tuition as consideration in exchange for Defendants providing Plaintiff with an education.

140.   By enrolling Plaintiff at Defendants' school and paying Defendant's tuition, and by Defendants accepting Plaintiff as a student, the parties each agreed to abide by the policies and conduct as set forth in the Defendants' bylaws and Parent and Student Handbook[14] as well as any applicable law.

141.   Plaintiff is a third-party beneficiary of said contract.

142.   Defendants breached said contract when it failed to provide a safe and appropriate environment for Plaintiff.  Defendants failed to abide by its own bylaws and disciplinary policies and failed to abide by federal law regarding Title IX.

143.   Plaintiff suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of future earnings, and past and ongoing medical expenses, and loss of tuition because of Defendants' breach of contract and failure to provide Plaintiff with a safe and appropriate learning environment for her education.

**COUNT VII**
**VIOLATION OF THE MICHIGAN CONSUMERS PROTECTION ACT**
**PURSUANT TO MCL 445.903(1)(e), (n), and (x)**
**AS TO DEFENDANT POTTER AND DEFENDANT FOUNDATION**

Paragraphs 1 through 143 and its subparts are incorporated by reference as if stated in full herein.

---

[14] www.tphgr.org

33

144. Plaintiff's parent entered into a contract with Defendants Potter and Foundation by enrolling Plaintiff in The Potter's House school.

145. Said contract was an on-going contract and arguably under the terms and conditions of MCL 445.903(1).

146. Plaintiff is a third-party beneficiary of said contract.

147. Plaintiff's parent paid Defendants Potter and Foundation's tuition as consideration in exchange for Defendants Potter and Foundation providing Plaintiff with an education. Defendants Potter and Foundation represented services of a particular standard, quality, or grade, and Defendants Potter and Foundation failed to provide services as represented.[15]

148. By enrolling Plaintiff at Defendants Potter and Foundation's school and paying Defendants Potter and Foundation's tuition, and by Defendants Potter and Foundation accepting Plaintiff as a student and accepting tuition, the parties each agreed to abide by the policies and conduct as set forth in the Defendants Potter and Foundation's bylaws and Parent and Student Handbook[16] as well as any applicable law. Defendants Potter and Foundation caused a probability of confusion and misunderstanding as to the legal rights, obligations, or remedies available.[17]

149. Defendants Potter and Foundation took advantage of Plaintiff's inability to reasonably protect her interests by reason of Plaintiff's disability

---

[15] MCL 445.903(1)(e)
[16] Attachment B
[17] MCL 445.903(1)(n)

(youthfulness), and Defendants Potter and Foundation knew or reasonably should have known of Plaintiff's disability.[18]

150. Plaintiff suffered emotional distress, psychological damages, physical manifestation of psychological distress, humiliation, loss of self-esteem, loss of enjoyment of life, loss of future earnings, and past and ongoing medical expenses, and loss of tuition because of Defendants Potter and Foundation's breach of contract, violation of the Michigan Consumers Act ("MCA"), and failure to provide Plaintiff with a safe and appropriate learning environment for her education.

151. Plaintiff is entitled to her statutory damages and attorney fees as enumerated in the MCA.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor and against Defendants in excess of Twenty-Five Thousand Dollars ($25,000) as follows:

A. Compensatory damages for Plaintiff's psychological and emotional distress, physical manifestation of emotional distress, embarrassment, loss of self-esteem, humiliation, loss of enjoyment of life, prevention of obtaining full enjoyment of life, loss of earnings past, present, and future, loss of earning capacity, past, present, and future expenses for medical and psychological treatment and therapy;

B. Punitive damages;

C. Injunctive relief requiring Defendants to take effective steps to prevent sex-based discrimination and harassment, including sexual assault, in all its

---

[18] MCL 445.903(1)(x)

programs and activities; fully investigate conduct that may constitute sex-based harassment and/or sexual assault; mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it;

D. Actual damages for tuition paid to Defendants Potter and Foundation;

E. Statutory interest;

F. Costs;

G. Reasonable attorney fees; and

H. Such other relief as the court deems appropriate.

## JURY DEMAND

Now comes Plaintiff, by and through her attorneys, Temperance Legal Group PLLC and A. Frazho Law Office, PLLC, and demands a trial by jury.

Dated: January 12, 2023

Karen Truszkowski (P56929)
Temperance Legal Group PLLC
Attorneys for Plaintiff
503 Mall Court #131
Lansing, MI 48912
1-844-534-2560 phone
800-531-6257 fax
Karen@temperancelegalgroup.com

Dated: January 11, 2023

/s/ Antoinette G. Frazho     (see attached)
Antoinette G. Frazho (P49718)
A. Frazho Law Office, PLLC
Attorneys for Plaintiff
1310 Hudgins Pass
Richmond, TX 77469
517-327-6979 phone
855-815-0051 fax
afrazho@frazholaw.com

36

based harassment and/or sexual assault; mitigate the effects of harassment and/or assault including by eliminating any hostile environment that may arise from or contribute to it;

D. Actual damages for tuition paid to Defendants Potter and Foundation;

E. Statutory interest:

F. Costs;

G. Reasonable attorney fees; and

H. Such other relief as the court deems appropriate.

## JURY DEMAND

Now comes Plaintiff, by and through her attorneys, Temperance Legal Group PLLC and A. Frazho Law Office, PLLC, and demands a trial by jury.

Dated: January _____, 2023

Karen Truszkowski (P56929)
Temperance Legal Group PLLC
Attorneys for Plaintiff
503 Mall Court #131
Lansing, MI 48912
1-844-534-2560 phone
800-531-6257 fax
Karen@temperancelegalgroup.com

Dated: January 11, 2023

Antoinette G. Frazho (P49708)
A. Frazho Law Office, PLLC
Attorneys for Plaintiff
1310 Hudgins Pass
Richmond, TX 77469
517-327-6979 phone
855-815-0051 fax
afrazho@frazholaw.com

36

STATE OF MICHIGAN

IN THE 17TH CIRCUIT COURT FOR THE COUNTY OF KENT

JANE DOE, by next friend, RHONDA
BROWN,

        Plaintiff,

  v.

THE POTTER'S HOUSE,
THE POTTER'S FOUNDATION, PAUL DEBOER
in his official capacity as President of THE POTTER'S
FOUNDATION, JOHN BOOY individually and in his official
capacity as Superintendent for THE POTTER'S HOUSE,
MARK PONSTINE individually and in his
official capacity as Principal for THE POTTER'S
HOUSE, and ALF CLARK individually and in his official
capacity as Principal for THE POTTER'S HOUSE,

        Defendants.

Hon. _____ GEORGE JAY QUIST _____

Case No. 2023-0 0 4 6 3-NO

REC'D & FILED

'JAN 1 8 2023

JUDGE QUIST
17TH CIRCUIT COURT

Karen Truszkowski (P56929)
Temperance Legal Group PLLC
Attorney for Plaintiff
503 Mall Court #131
Lansing, MI  48912
844-534-2560 phone
800-531-6527 fax
Karen@temperancelegalgroup.com

Antoinette G. Frazho (P49718)
A. Frazho Law Office, PLLC
Co-Counsel for Plaintiff
1310 Hudgins Pass
Richmond, TX 77469
517-327-6979 phone
855-815-0051 fax
afrazho@frazholaw.com

1

Doc ID: 98dff8d37d3879ec50659bd08741d14918f7b438

2. There **HAS/HAS NOT** not been good cause shown to grant the Motion to Proceed Under Pseudonym as the documents filed and to be filed in this matter contain confidential personal information of a survivor of sexual assault and child abuse.

**IT IS SO ORDERED.**

_____
Hon.
Circuit Court Judge

Countersigned:


_____
Deputy Clerk

4